Mar 3, 2026    **Argentina**    **Colombia**    **Spain**

REGISTER    LOG IN

19 minutes ago    **Trends**    Saudi Arabia    Andrea Del Boca    Franco Mastantuono    Teachers' Strike    Employ

**POLITICS >**

# Exclusive: another bank in the US that handled AFA funds and transferred USD 3 million to shell companies was found.

A judicial investigation accessed by Infobae revealed that Tourprodenter, the company that operated under the orders of Claudio "Chiqui" Tapia, received and transferred more than 13 million dollars in one year. Which companies had suspicious transfers

By **Facundo Chaves**

Follow on

Feb 27, 2026 01:47 am   Updated: Feb 27, 2026 12:13 p.m. AR



The ad has been removed. Details

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The financial structure used by the **Argentine Football Association (AFA)** from the United States is more complex than we knew so far. In addition to the four banks already identified in previous investigations–Bank of America, Citibank, JP Morgan, and Synovus–a new entity has been added: **PNC Bank.** According to exclusive documentation accessed by *Infobae*, **Tourprodenter,** the company of **Javier Faroni** and **Erica Gillette,** appointed by decision of **Claudio "Chiqui" Tapia** as the exclusive collection agent of the international contracts of the Argentine National Team, also operated in that **Pittsburgh** entity to channel funds linked to the AFA. **The U.S. and Argentine courts already have open investigations into the destination, which may exceed 300 million dollars.**

**You may be interested in:**

**Who were the two victims, aged 19 and 17, who died after a brutal crash into a tree in Córdoba**



Bank records obtained through court orders in the United States - at the request of a discovery process by businessman **Guillermo Tofoni** - reveal that, in less than a year, **USD 13,554,200.64** circulated through that account. The account at **PNC Bank** was funded through transfers from companies associated with international contracts – including *STAR RIGHTS LIMITED, COTTI COFFEE INTERNATIONAL LIMITED, SOCIOS TECHNOLOGIES AG, WISE US,* and other foreign firms – and through internal movements from other accounts of **Tourprodenter** itself.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER



The U.S. and Argentine courts already have open investigations into the destination, which may exceed 300 million dollars.

That detail is central to the investigation. **The documents show transfers between accounts within the same structure, without the records allowing for precise identification of the primary source of the funds.** Part of the money that entered **PNC Bank** came from previous accounts whose traceability cannot be reconstructed with the available statements and was provided in the aforementioned judicial proceedings. The scheme indicates the existence of a network of interconnected accounts used to redistribute resources linked to international contracts and service payments.

> **You may be interested in:**
> **Parents living longer and children who can't leave: The Silent Exhaustion of the Sandwich Generation**
>

From that account, the money was transferred in short periods of time – often within 24 to 72 hours after the deposit. From a long list of dozens of companies - ranging from a Uruguayan financial company to the payment of private jets and various services - **USD 3,171,800** were sent to five companies – **Soagu, Marmasch, Delker, Velpasalt, and Mafer** – which, after being exposed in journalistic investigations, the

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The discovery expands the banking map used to channel the **AFA's** international contracts and confirms that the scheme detected in other accounts – concentrated income, immediate fragmentation, and transfers to companies without verifiable activity – was present in this new financial institution.

> **You may be interested in:**
> **The new lives that Gordo, Florencia, and Flora started in European sanctuaries after the rescue of the former Luján zoo**
>  ›

**Guillermo Tofoni**, a FIFA agent with extensive experience in the world of soccer, appeared before authorities in the United States for the breach of the contract that Tapia had signed for the organization of friendly matches. In the claims before U.S. courts, the businessman argued economic damage, having been unilaterally removed and replaced by a structure that had **TourProdenter, owned by Faroni and Gillette,** at the center.



Chiqui Tapia and Javier Faroni

## The financial architecture

The **PNC Bank** account functioned as an additional piece within a structured financial architecture. Throughout early 2024, they

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The exclusive documentation accessed by this media outlet shows shipments from Star Rights for almost **USD 2,900,000,** Cotti Coffee International for **USD 812,000**, and Assist Card Smalline for **USD 480,000.** Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball, and Bill.com, among others, also appear. Most of these resources are from sponsorships in China, Europe – especially in Malta – and the United Arab Emirates.

Not all of the funds came from identifying third parties. Part of the income originated in other **Tourprodenter** accounts, the full details of which do not appear on the statements assessed. **Internal movements suggest the existence of an interconnected financial network, where PNC Bank operated as one more node within a larger circuit.**



Internal movements suggest the existence of an interconnected financial network, where PNC Bank operated as one more node within a larger circuit.

Bank records show that the money did not remain in the account but was redistributed in a matter of hours or days. Outbound transfers repeated a pattern of immediate fragmentation, multiple recipients, and transient balances. The total number of expenses practically coincides with the total number of incomes, confirming that the account worked as a conduit rather than a tool for accumulation.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Uruguay, the recovered records show the names of Soagu (**USD 1,205,500** in seven transfers), Marmasch (**USD 764,800** in four transfers), Delker (**USD 675,000** in three operations), Velpasalt (**USD 273,000**), and Mafer (**USD 252,500**). Together, these five companies received **USD 3,171,800,** about a quarter of the total traded.

**The sequence repeats itself: significant revenues followed by a chain of transfers in the short term, with amounts around USD 100,000 or USD 200,000, and a structure that responds to a repeated mechanism, not to isolated payments.**

The existence of this fifth account expands the number of banks involved and confirms that the redistribution scheme detected in the other banks was not circumstantial either. The pattern reappears: international contracts channeled to an account in the United States, internal movements between own accounts, and fragmentation towards a combination of recipients that includes a regional financial company and companies that were subsequently dissolved.

**Shell companies: structures, profiles, and dissolution**



Soagu, Marmasch, Delker, Velpasalt, and Mafer are listed as recipients of transfers.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The companies present in **PNC Bank**'s statements are not new to the structure under investigation. Soagu, Marmasch, Delker, Velpasalt, and Mafer appear as recipients of transfers from the other four banks that appeared in the first publication of the movements of the "AFA box." Exclusive corporate documentation obtained for this article shows that these same companies also operated as recipients of funds in this fifth bank account.

After last December, based on the first investigations into **Tourprodenter's** financial circuit and **AFA**'s international contracts, several of these companies were dissolved or ceased to register formal activity. The bank movements now revealed correspond to a period prior to the scandal, which reinforces the analysis of how and why these companies accumulated millions of dollars before disappearing from the commercial register.

**Verifiable corporate records show patterns: repeated addresses in buildings where dozens of companies operate, common registry agents, and recent incorporations regarding the time when they began to receive transfers.** The formal heads of these companies lack known assets or a business trajectory, according to millionaire operations linked to international contracts of the Argentine National Team.

The contrast emerges in the records: funds from high-value international trade agreements ended up in companies that, after the scandal, disappeared from the corporate map. A bank account whose existence was not part of the initial survey appears in the center of the flow.

The appearance of **PNC Bank** as the fifth entity involved reinforces a characteristic of the scheme: banking dispersion. The money related to international contracts circulated through at least five financial institutions in the United States. This level of fragmentation makes it difficult to reconstruct the circuit in its entirety and shows an architecture that is geared towards ensuring that the entire flow cannot be observed from a single point.

A large part of the funds was transferred between accounts within the structure itself.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The sum of these elements – fifth bank, network of interconnected accounts, fragmentation, and transfers to companies later dissolved – exposes a mechanism that, in less than a year, transferred more than **USD 13,500,000** and diverted more than **USD 3,000,000** to companies whose structure and continuity were not sustained after being investigated. It is a new case that adds to the nearly 300 million that were transferred from Bank of America, Citibank, JP Morgan, and Synovus.

**The preliminary investigation in U.S. courts seeks to determine the full scope of that financial architecture.** The new documentation reveals that the circuit was not limited to the previously identified accounts: there was one more, with the same operating pattern.



In less than a year, more than USD 13,500,000 were transferred, and more than USD 3,000,000 were diverted to companies whose structure and continuity were not sustained after being investigated.

## Who is behind the shell companies?

Behind the names on **PNC Bank'**s bank statements are not only business conglomerates or consolidated firms in the international business. **The companies that received more than USD 3,000,000 from this fifth account share opaque structures, little visible activity, and owners without records**

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

According to a reconstruction revealed weeks ago by the newspaper La Nación, Soagu Services LLC appears linked to Javier Alejandro Ojeda Jara, a resident of **Bariloche**. He worked as a dependent in a pharmacy, had debts in the Argentine financial system, and was a pre-assignee of social housing. In addition to the amounts of the other banks, the company received transfers from the Pittsburgh bank for **USD 1,205,500** in seven transfers.

Marmasch LLC was registered in the name of Mariela Marisa Schmalz, also from **Bariloche**. According to public records revealed by that newspaper, she worked as an employee in a decoration store and had a judicial record for debts, in addition to being linked to Ojeda Jara. In the **PNC Bank** account, Marmasch received USD $764,800 in four transfers.

**As for Velpasalt, Roberto Salice, administrator and owner with a history of bankruptcy and judicial proceedings, was linked.** Velpasalt received **USD $273,000** in 2024 before the dissolution following the scandal.

Mafer Trading was associated with Matías E. Fernández. The name ("Mafer") replicates that of Marmasch – the initials of the name and surname of the former owner. Fernández has employment and registry records unrelated to any company receiving large sums of money. At **PNC Bank**, Mafer received **USD $252,500**.

Delker, on the other hand, is part of a set of "twin" companies created simultaneously, with a similar domicile and structure. The director was Sandro Máximo Salas Sevilla, based in a "virtual office" in **Doral, Florida,** with no real operations identified. Delker received **USD 675,000** in three transfers during 2024.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER



The headquarters of the AFA

The corporate documentation shows owners with limited economic profiles and no background in business. These are not companies with a presence in the sports rights market, but companies with **low public visibility that concentrated millions of dollars from international AFA contracts.**

**The transfer circuit: Bariloche, Miami, and the dissolution after the scandal**

In 2024, while more than **USD 13,500,000** associated with international **AFA** contracts circulated in **PNC Bank**, Soagu received seven transfers for **USD 1,205,500,** Marmasch **USD 764,800,** and Delker **USD 675,000.** All of these companies were low-profile holders with no significant background in business.

The verified sequence: these companies received millionaire transfers from an account operated by **Tourprodenter** in **PNC Bank**. By December 2025, when the financial circuit came to light, several of these structures were dissolved. These companies appear in several banks used by the administrative structure of

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Meanwhile, some of the funds came from companies linked to international contracts, and some others came from other unidentified Tourprodenter accounts. This internal intertwining prevents us from reconstructing the exact origin of some transactions and suggests a broader financial network.

The total volume recorded in this fifth account – USD 13,554,200.64 – represents only a fraction of the universe managed by Tourprodenter, which managed more than USD 260 million in international contracts from AFA.

With this finding, the banking map is expanded and confirms that the structure worked in fragmented multiple entities in the United States, with transfers to dissolved companies being part of the operation before public exposure.

At the center of the network is Tourprodenter, the company of Javier Faroni and Erica Gillette, chosen by Tapia as the exclusive agent for the collection of international contracts. That decision concentrated the administration of hundreds of millions of dollars in a private structure. The judicial documentation shows that part of that flow transited through an account so far unidentified in the investigation.



Businessman Guillermo Tofoni appeared before U.S. authorities to denounce Tapia and Toviggino (photo Gustavo Gavotti)

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

The decision to concentrate the international contracts of the Argentine National Team in a private structure was political. **Claudio "Chiqui" Tapia** appointed **Tourprodenter** as exclusive collection agent, handing over to a private company the administration of amounts that could not yet be determined by global sponsorship agreements and strategic alliances. The commercial power of Lionel Messi's National Team, after the consecration in Qatar 2022, grew exponentially.

**Tourprodenter** does not correspond to a multinational specializing in sports rights, but to a company linked to Faroni and Gillette. Since he received the mandate, he concentrated the international turnover of the **AFA**, collecting payments from sponsors and commercial operators in his own accounts in the United States and redistributing the funds according to contracts and obligations. Due to the agreement signed by Tapia and Treasurer Pablo Toviggino, Faroni's company was left with 40%, 10 percent in terms of logistics.

While the investigation in the United States seeks the scope of the circuit, the added documentation provides a key piece: the money from the contracts of the National Team not only went through four financial institutions. There was a fifth account, and, during 2024, the pattern of transfers and dissolved companies re-emerged.

**Other destinations of the funds: logistics, travel, and corporate services**

In addition to transfers to companies subsequently dissolved, **PNC Bank**'s account records payments to companies with identifiable economic activity, primarily in logistics, aviation, travel, and corporate services.

**The most significant block corresponds to logistics and international transport operations.** Aero Logistics Investments concentrated **USD 920,000** in four transfers; Interlog LLC received **USD 790,500** in three shipments; and PLS Logistic LLC accumulated **USD 753,506** in four operations. These are multimodal transport companies, cargo management, and international logistics, areas linked to the movement of delegations and commercial operations.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

respectively, they have links with financial or technological consulting. Porto Consulting Group, BA Design Group, and Pacific Investment Advisor together exceed **USD 760,000**.

In the area of travel and aviation, Entertainment Travel Group received **USD 261,666.90** in four transfers. **World Fuel Services**, a global fuel supplier, accumulated **USD 164,202.46**, while *Gestair S.A.U.* received **USD 28,913.67**. Precision Jet Avionics, Atlantic Jet North, and Aircraft Parts & Spares Inc. also received payments.

**The rest of the transfers correspond to complementary services or individual payments.** Innovation Sound System received **USD 35,830**; Sport Business Invest,



Follow us:

Facebook   X   Instagram   YouTube   Telegram   LinkedIn

**Sections**

America   Colombia   Spain   United States   Mexico   Peru   Central America   Latest News

RSS

Contact Us

Editorial team    Employment

**Business Contact**

Argentina   Colombia   Spain   Mexico   Peru   Media Kit

**Legal**

Terms and Conditions    Privacy Policy

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

**All rights reserved © 2026 Infobae**

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER



# TRANSLATION CERTIFICATION

Date: 2026/03/13

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Spanish (Latin America)

To:

- English (USA)

The documents are designated as:

- '16-Noticia filtrada por Tofoni-Exclusivo_ hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma - Infobae.pdf'

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

POLÍTICA >

# Exclusivo: hallaron otro banco en EEUU que manejó fondos de la AFA y giró USD 3 millones a empresas fantasma

Una investigación judicial a la que accedió Infobae reveló que Tourprodenter, la sociedad que operó a órdenes de Claudio "Chiqui" Tapia, recibió y transfirió más de 13 millones de dólares en un año. Cuáles son las compañías que tuvieron giros sospechosos

Por **Facundo Chaves**

( + Seguir en G )

27 Feb, 2026 01:47 a.m.  |  Actualizado: 27 Feb, 2026 12:13 p.m. AR

( f ) ( ⊙ ) ( X ) ( in ) ( ◁ ) ( 🔖 )



Se ha retirado el anuncio. Detalles

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

La estructura financiera utilizada por la **Asociación del Fútbol Argentino (AFA)** desde Estados Unidos es más extensa de lo que se conocía hasta ahora. A los cuatro bancos ya identificados en investigaciones previas —Bank of America, Citibank, JP Morgan y Synovus— se suma una nueva entidad: **PNC Bank**. Según documentación exclusiva a la que accedió *Infobae*, **Tourprodenter**, la empresa de **Javier Faroni** y **Erica Gillette** designada por decisión de **Claudio "Chiqui" Tapia** como agente exclusivo de cobro de los contratos internacionales de la Selección argentina, también operó en esa entidad de **Pittsburgh** para canalizar fondos vinculados a la AFA. **La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares.**

> Te puede interesar:
>
> **Quiénes eran los dos jóvenes de 19 y 17 años que murieron tras un brutal choque contra un árbol en Córdoba**

Registros bancarios obtenidos a través de órdenes judiciales en Estados Unidos -a instancias de un proceso de *discovery* solicitado por el empresario **Guilermo Tofoni**- revelan que, en menos de un año, por esa cuenta circularon **USD 13.554.200,64**. La cuenta en **PNC Bank** se fondeaba mediante transferencias de empresas asociadas a contratos internacionales —entre ellas *STAR RIGHTS LIMITED*, *COTTI COFFEE INTERNATIONAL LIMITED*, *SOCIOS TECHNOLOGIES AG*, *WISE US* y otras firmas del exterior— y a través de movimientos internos desde otras cuentas de la propia **Tourprodenter**.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER




La Justicia de EEUU y la de la Argentina ya tienen abiertas investigaciones sobre el destino que puede superar los 300 millones de dólares

Ese detalle resulta central en la investigación. **Los documentos exhiben transferencias entre cuentas de la misma estructura sin que los registros permitan identificar con precisión el origen primario de los fondos.** Parte del dinero que ingresaba al **PNC Bank** provenía de cuentas previas cuya trazabilidad no puede reconstruirse con los extractos disponibles y aportados en las actuaciones judiciales de referencia. El esquema indica la existencia de una red de cuentas interconectadas utilizadas para redistribuir recursos vinculados a contratos internacionales y hacer pagos de servicios.

> Te puede interesar:
> **Padres que viven más e hijos que tardan en irse: el agotamiento silencioso de la generación sándwich**

Desde esa cuenta, el dinero era girado en lapsos breves —muchas veces dentro de las 24 a 72 horas posteriores al ingreso—. De un largo listado de decenas de empresas -que van de una financiera de Uruguay al pago de aviones privados y servicios varios- **USD 3.171.800** se enviaron a cinco sociedades —**Soagu, Marmasch, Delker, Velpasalt y Mafer**— que, tras quedar expuestas en investigaciones periodísticas, la

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

El descubrimiento amplía el mapa bancario utilizado para canalizar los contratos internacionales de la **AFA** y confirma que el esquema detectado en otras cuentas — ingresos concentrados, fragmentación inmediata y transferencias a sociedades sin actividad verificable— se repitió en esta nueva entidad financiera.

> Te puede interesar:
>
> **Las nuevas vidas que Gordo, Florencia y Flora iniciaron en santuarios europeos tras el rescate del ex zoológico de Luján**     ›

**Guillermo Tofoni**, agente FIFA y con amplia trayectoria en el mundo del fútbol, se presentó ante autoridades de los Estados Unidos por la ruptura del contrato que había firmado Tapia para la organización de amistosos. En los reclamos ante tribunales de norteamericanos, el empresario esgrimió un perjuicio económico, al haber sido apartado de manera unilateral y reemplazado por una estructura que tuvo a **TourProdenter, de Faroni y Gillette**, en el epicentro.



Chiqui Tapia y Javier Faroni

## La arquitectura financiera

La cuenta del **PNC Bank** funcionaba como una pieza adicional dentro de una arquitectura financiera estructurada. A lo largo de menos del 2024, circularon por esa

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

por la documentación exclusiva a la que accedió este medio muestran envíos de Star Rights por casi **USD 2.900.000**, Cotti Coffee International por **USD 812.000**, Assist Card Smalline por **USD 480.000**. También aparecen Smartsoft, Prestige One Luxury Real Estate, Socios Technologies, Sports Licensing, Wise US, Global FC, AW Capital (W88), Guardians of the Ball y Bill.com, entre otral. La mayoría de esos recursos son de patrocinios en China, Europa —sobre todo, en Malta— y Emiratos Árabes Unidos.

No todos los fondos provenían de terceros identificables. Parte de los ingresos se originaba en otras cuentas de **Tourprodenter**, cuyos datos completos no aparecen en los extractos evaluados. **Los movimientos internos sugieren la existencia de una red financiera interconectada, donde el PNC Bank operaba como un nodo más dentro de un circuito mayor.**



Los movimientos internos sugieren la existencia de una red financiera interconectada, donde el PNC Bank operaba como un nodo dentro de un circuito mayor

Los registros bancarios demuestran que el dinero no permanecía en la cuenta, sino que era redistribuido en cuestión de horas o días. Las transferencias salientes repetían un patrón de fragmentación inmediata, múltiples destinatarios y saldos transitorios. El total de egresos prácticamente coincide con el total de ingresos, confirmando que la cuenta funcionó como canal de paso y no como instrumento de acumulación.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Uruguay, los registros recuperados muestran los nombres de Soagu (**USD 1.205.500** en siete transferencias), Marmasch (**USD 764.800** en cuatro envíos), Delker (**USD 675.000** en tres operaciones), Velpasalt (**USD 273.000**) y Mafer (**USD 252.500**). En conjunto, estas cinco sociedades recibieron **USD 3.171.800**, cerca de una cuarta parte del total operado.

**La secuencia se repite: ingresos significativos seguidos por una cadena de giros en plazos breves, con montos que rondan los USD 100.000 o USD 200.000 y una estructura que responde a un mecanismo reiterado, no a pagos aislados.**

La existencia de esta quinta cuenta amplía el número de entidades bancarias involucradas y confirma que el esquema de redistribución detectado en los otros bancos tampoco fue circunstancial. El patrón vuelve a aparecer: contratos internacionales canalizados hacia una cuenta en Estados Unidos, movimientos internos entre cuentas propias y fragmentación hacia una combinación de destinatarios que incluye una financiera regional y sociedades posteriormente disueltas.

## Sociedades fantasma: estructuras, perfiles y disolución



Soagu, Marmasch, Delker, Velpasalt y Mafer figuran como destinatarias de transferencias

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Las sociedades presentes en los extractos del **PNC Bank** no son nuevas en la estructura investigada. Soagu, Marmasch, Delker, Velpasalt y Mafer figuran como destinatarias de transferencias de los otros cuatro bancos que aparecieron en la primera revelación de los movimientos de la "caja de la AFA". Documentación societaria exclusiva obtenida para este artículo muestra que estas mismas empresas también operaron como receptoras de fondos en esta quinta cuenta bancaria.

Después de diciembre pasado, a partir de las primeras investigaciones sobre el circuito financiero de **Tourprodenter** y los contratos internacionales de la **AFA**, varias de esas empresas fueron disueltas o dejaron de registrar actividad formal. Los movimientos bancarios ahora revelados corresponden a un periodo anterior al escándalo, lo que refuerza el análisis sobre cómo y por qué estas sociedades concentraron millones de dólares antes de desaparecer del registro comercial.

**Los registros societarios verificables exhiben patrones: domicilios repetidos en edificios donde funcionan decenas de compañías, agentes registrales en común y constituciones recientes respecto al momento en que comenzaron a recibir transferencias.** Los responsables formales de esas sociedades carecen de patrimonio conocido o trayectoria empresarial acorde a operaciones millonarias vinculadas con contratos internacionales de la Selección argentina.

El contraste emerge en los registros: fondos de acuerdos comerciales internacionales de alto valor terminaron en sociedades que, tras el escándalo, desaparecen del mapa societario. Una cuenta bancaria cuya existencia no formaba parte del relevamiento inicial aparece en el centro del flujo.

La aparición del **PNC Bank** como quinta entidad involucrada refuerza una característica del esquema: la dispersión bancaria. El dinero relacionado a los contratos internacionales circuló por al menos cinco entidades financieras en Estados Unidos. Ese nivel de fragmentación dificulta la reconstrucción integral del circuito y evidencia una arquitectura orientada a que el flujo completo no pueda observarse desde un solo punto.

Es que buena parte de los fondos se transfería entre cuentas de la propia estructura

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

La suma de estos elementos —quinto banco, red de cuentas interconectadas, fragmentación y transferencias a sociedades luego disueltas— expone un mecanismo que, en menos de un año, movió **más de USD 13.500.000** y derivó **más de USD 3.000.000** hacia compañías cuya estructura y continuidad no se sostuvieron tras ser investigadas. Es un nuevo caso que se suma a los cerca de 300 millones que se movieron de Bank of America, Citibank, JP Morgan y Synovus.

**La investigación preliminar en tribunales de Estados Unidos busca determinar el alcance completo de esa arquitectura financiera.** La nueva documentación revela que el circuito no se limitaba a las cuentas previamente identificadas: existía una más, con el mismo patrón operativo.



En menos de un año se movieron más de USD 13.500.000 y se derivaron más de USD 3.000.000 hacia compañías cuya estructura y continuidad no se sostuvieron tras ser investigadas

## Quiénes están detrás de las sociedades fantasma

Detrás de los nombres en los extractos bancarios del **PNC Bank** no figuran sólo conglomerados empresariales ni firmas consolidadas del negocio internacional. **Las sociedades que recibieron más de USD 3.000.000 desde esta quinta cuenta comparten estructuras opacas, escasa actividad visible y titulares sin antecedentes**

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Según una reconstrucción que reveló semanas atrás el diario La Nación, Soagu Services LLC aparece vinculada con Javier Alejandro Ojeda Jara, residente en **Bariloche**. Trabajaba en relación de dependencia en una farmacia, tenía deudas en el sistema financiero argentino y fue preadjudicatario de vivienda social. A los montos de los otros bancos se le suma que la sociedad recibió transferencias desde el banco de Pittsburgh por **USD 1.205.500** en siete giros.

Marmasch LLC estaba registrada a nombre de Mariela Marisa Schmalz, también de **Bariloche**. Según consta en registros públicos revelados por ese matutino, trabajaba como empleada en un local de decoración y presentaba antecedentes judiciales por deudas, además de estar vinculada con Ojeda Jara. En la cuenta del **PNC Bank**, Marmasch recibió **USD 764.800** en cuatro transferencias.

**En cuanto a Velpasalt, se vinculó a Roberto Salice, señalado como administrador y titular, con antecedentes de quiebra y actuaciones judiciales.** Velpasalt recibió **USD 273.000** en 2024 antes de la disolución tras el escándalo.

Mafer Trading fue asociada a Matías E. Fernández. El patrón de denominación ("Mafer") replica el de Marmasch —siglas de nombre y apellido del titular formal—. Fernández tiene antecedentes laborales y registrales alejados de cualquier firma receptora de sumas importantes. En **PNC Bank**, Mafer recibió **USD 252.500**.

Delker, por su parte, forma parte de un conjunto de sociedades "gemelas" creadas simultáneamente, con domicilio y estructura similar. El director era Sandro Máximo Salas Sevilla, asentado en una "oficina virtual" en **Doral, Florida**, sin operaciones reales identificadas. Delker recibió **USD 675.000** en tres transferencias durante 2024.

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER



La sede de la AFA

La documentación societaria muestra titulares con perfiles económicos limitados y sin antecedentes empresariales relevantes. Estas no son empresas con presencia en el mercado de derechos deportivos, sino **sociedades de baja visibilidad pública que concentraron millones de dólares provenientes de contratos internacionales de la AFA.**

## El circuito de transferencias: Bariloche, Miami y la disolución tras el escándalo

En 2024, mientras por la cuenta en **PNC Bank** circulaban **más de USD 13.500.000** asociados a contratos internacionales de la **AFA**, Soagu recibió siete transferencias por **USD 1.205.500**, Marmasch **USD 764.800** y Delker **USD 675.000**. Todas estas sociedades respondían a titulares de bajo perfil y sin antecedentes comerciales significativos.

La secuencia verificada: esas sociedades recibieron transferencias millonarias de una cuenta operada por **Tourprodenter** en **PNC Bank**. Para diciembre de 2025, cuando el circuito financiero salió a la luz, varias de estas estructuras estaban disueltas. Estas empresas aparecen en varios bancos utilizados por la estructura administradora de

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

**Mientras tanto, parte de los fondos provenía de empresas vinculadas a contratos internacionales y parte ingresaba desde otras cuentas de Tourprodenter no identificadas.** Ese entrecruzamiento interno impide reconstruir el origen exacto de algunos movimientos y sugiere una red financiera más amplia.

El volumen total registrado en esta quinta cuenta —**USD 13.554.200,64**— representa sólo una fracción del universo administrado por **Tourprodenter**, que gestionó más de **USD 260 millones** en contratos internacionales de la **AFA**.

Con este hallazgo, se amplía el mapa bancario y confirma que la estructura funcionó fragmentada en múltiples entidades en Estados Unidos, con transferencias a sociedades disueltas formando parte de la operatoria antes de la exposición pública.

En el centro del entramado está **Tourprodenter**, la sociedad de **Javier Faroni y Erica Gillette**, elegida por **Tapia** como agente exclusivo del cobro de contratos internacionales. Esa decisión concentró en una estructura privada la administración de cientos de millones de dólares. La documentación judicial demuestra que parte de ese flujo transitó por una cuenta hasta ahora no identificada en la investigación.



El empresario Guillermo Tofoni se presentó ante autoridades de Estados Unidos para denunciar a Tapia y Toviggino (foto Gustavo Gavotti)

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

La decisión de concentrar los contratos internacionales de la Selección argentina en una estructura privada fue política. **Claudio "Chiqui" Tapia** designó a **Tourprodenter** como agente exclusivo de cobro, entregando a una empresa privada la administración de montos que aun no se pudieron determinar por acuerdos globales de patrocinio y sponsors y alianzas estratégicas. Es que la potencia comercial de la Selección de Lionel Messi, después de la consagración en Qatar 2022, creció de manera exponencial.

**Tourprodenter** no corresponde a una multinacional especializada en derechos deportivos, sino a una sociedad vinculada a Faroni y Gillette. Desde que recibió el mandato, concentró la facturación internacional de la **AFA**, cobrando pagos de patrocinadores y operadores comerciales en cuentas propias en Estados Unidos y redistribuyendo los fondos según contratos y obligaciones. Por el convenio que firmó Tapia y el tesorero Pablo Toviggino, la empresa de Faroni se quedaba con 40%, 10 por iento en materia de logística.

Mientras la investigación en Estados Unidos busca el alcance del circuito, la documentación sumada aporta una pieza clave: el dinero de los contratos de la Selección no sólo pasó por cuatro entidades financieras. Hubo una quinta, y en esa cuenta, durante 2024, se repitió el patrón de transferencias a sociedades disueltas.

## Otros destinos de los fondos: logística, viajes y servicios corporativos

Además de las transferencias hacia sociedades posteriormente disueltas, la cuenta de **PNC Bank** registra pagos a empresas con actividad económica identificable, principalmente en logística, aviación, viajes y servicios corporativos.

**El bloque más significativo corresponde a operaciones logísticas y de transporte internacional.** Aero Logistics Investments concentró **USD 920.000** en cuatro transferencias; Interlog LLC recibió **USD 790.500** en tres envíos; y PLS Logistic LLC acumuló **USD 753.506** en cuatro operaciones. Se trata de compañías de transporte multimodal, gestión de carga y logística internacional, áreas vinculadas a desplazamiento de delegaciones y operaciones comerciales.

Glaccess LLC recibió **USD 718.700** en cuatro giros, dedicándose a producción y

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

respectivamente, aparecen en vínculos con consultoría financiera o tecnológica. Porto Consulting Group, BA Design Group y Pacific Investment Advisor superan los **USD 760.000** en conjunto.

En el área de viajes y aviación, Entertainment Travel Group recibió **USD 261.666,90** en cuatro transferencias. **World Fuel Services**, proveedor global de combustible, acumuló **USD 164.202,46**, mientras que *Gestair S.A.U.* recibió **USD 28.913,67**. Se suman pagos a Precision Jet Avionics, Atlantic Jet North y Aircraft Parts & Spares Inc.

**El resto de las transferencias corresponde a servicios complementarios o pagos individuales.** Innovation Sound System recibió **USD 35.830**; Sport Business Invest,

Seguinos:

     

## Secciones

América   Colombia   España   Estados Unidos   México   Perú   Centroamérica   Últimas Noticias

RSS

## Contáctenos

Redacción   Empleo

## Contacto comercial

Argentina   Colombia   España   México   Perú   Media Kit

## Legales

Términos y Condiciones   Política de Privacidad

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER

Todos Los Derechos Reservados © 2026 Infobae

EXHIBIT 8 TO MOTION FOR PROTECTIVE ORDER